FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2014 DEC -4 P 2: 35

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| MARIA THOMPSON<br><br>Plaintiff,<br><br>v.<br><br>WALGREEN CO.<br>300 Wilmot Road<br>MS 3301<br>Deerfield, IL 60015<br><br>Defendant. | Civil Action No.<br><br>1:14 CV 1646<br>GBL/JFA<br><br>(Jury Trial Requested) |

## COMPLAINT

Plaintiff Maria Thompson, by and through undersigned counsel, for her Complaint against defendant, Walgreen Co. ("Walgreen's"), alleges as follows:

### JURISDICTION AND VENUE

1. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. Section 1331, as Thompson's claims are premised on the Federal Civil False Claims Act, codified at 31 U.S.C. Sections 3729-3733, as set forth herein.

2. This Court has supplemental jurisdiction over the claims brought under the laws of the Commonwealth of Virginia pursuant to 28 U.S.C. Section 1367, because a common nucleus of operative facts underlies both the federal and Virginia claims.

3. Venue is proper in the Eastern District of Virginia pursuant to 31 U.S.C. Section 3732 and 28 U.S.C. Section 1391 as the Defendant transacts business in this judicial district and the facts relevant to this matter transpired at Defendant's stores in this judicial district.

1

## PARTIES

4. Plaintiff Maria Thompson is a pharmacist licensed to practice in Virginia. Ms. Thompson worked for Walgreen's as a pharmacist from February 2007 through February 2014.

5. Defendant Walgreen Co. is an Illinois corporation that transacts business nationwide, including in multiple locations throughout this judicial district.

## FACTS

*Ms. Thompson's Walgreen's Employment from 2007-2013*

6. Walgreen's hired Ms. Thompson in February 2007 to work as a pharmacist.

7. Originally, Ms. Thompson split her work between Walgreen's Warrenton, Virginia and Stephen's City, Virginia stores, but in late 2007, she was transferred to Walgreen's Old Town Alexandria, Virginia location (Walgreen's Store Number 10617).

8. Ms. Thompson was a successful and hardworking employee.

9. Throughout Ms. Thompson's time at Walgreen's, she received positive performance reviews from supervisors.

10. From the beginning of her career including her employment with Walgreen's, Ms. Thompson was careful to diligently follow the laws and regulations governing the practice of pharmacy and distribution of controlled medications.

11. In 2008, Ms. Thompson learned that another pharmacist in her pharmacy, Olga Zytcer, was filling prescriptions for herself and her husband during her shift.

12. Medications for Zytcer or her husband sometimes arrived during Ms. Thompson's shifts.

13. On several occasions, Ms. Thompson noticed that the Zytcers' controlled-substance prescription was not due to be refilled at that time, and Ms. Thompson corrected the refill date in Walgreen's prescription management system.

14. Additionally, another Walgreen's pharmacy manager at another Walgreen's pharmacy told Ms. Thompson that she believed that controlled substances had gone missing when Ms. Zytcer worked at that pharmacy.

15. Based on this information, along with Zytcer's erratic behavior, Ms. Thompson believed that Walgreen's policy and federal and state regulations governing the practice of pharmacy required her to report Ms. Zytcer's potential violations to supervisors.

16. Ms. Thompson reported her suspicions to Walgreen's Pharmacy District Manager, Justin Coyle.

17. Mr. Coyle refused to investigate or otherwise act on the information Ms. Thompson provided him.

18. Later, Ms. Thompson received prescriptions for controlled substances for Mr. Zytcer that appeared to have been falsified.

19. Again, Ms. Thompson reported the potential impropriety to Walgreen's superiors, including Mr. Coyle and the Pharmacy Manager of her store, Bill Tessandori.

20. Mr. Coyle told Ms. Thompson to forget about her suspicions and work with Ms. Zytcer.

21. When Ms. Thompson protested, Mr. Coyle threatened that if Ms. Thompson did not fall into line and stop raising concerns, he would harm her career by telling every Walgreen's manager she worked with that Ms. Thompson was difficult to work with and a troublemaker.

22. Upon learning of Mr. Coyle's refusal to address her suspicions, Ms. Thompson reported her concerns to the Walgreen's District Business Manager, Rick Conner.

23. Upon information and belief, Mr. Conner did not investigate Ms. Thompson's suspicions.

24. Then, Ms. Thompson also discovered that Ms. Zytcer had used Ms. Thompson's computer log-in information and had impersonated Ms. Thompson over the telephone in order to transfer prescriptions from Walgreen's to another pharmacy.

25. Fearing that she would lose her license to practice pharmacy or be subject to criminal penalties for failing to report known violations, Ms. Thompson reported Ms. Zytcer to an official with the Federal Bureau of Investigations.

26. In the course of their investigation, the FBI reported Ms. Thompson's complaint to the Virginia Board of Pharmacy.

27. In 2008, the FBI and Virginia Board of Pharmacy verified Ms. Zytcer's unlawful activities and Walgreen's terminated her employment.

28. District Manager Coyle knew that Ms. Thompson had reported these violations to his supervisor Rick Conner, and upon information and belief, also learned that Ms. Thompson had reported Ms. Zytcer to the FBI.

29. Mr. Coyle was angry with Ms. Thompson for going above him with her complaints, and then reporting the violations which he had refused to remedy to law enforcement officials outside of Walgreen's.

30. Mr. Coyle was professionally embarrassed that Ms. Thompson had been proven right and he resented what he considered to be troublemaking by Ms. Thompson.

31. Mr. Coyle was openly hostile to Ms. Thompson following her complaints to his superiors.

32. Following Ms. Zytcer's termination, Mr. Coyle promoted Amir Soliman to Pharmacy Manager of the Old Town Alexandria Walgreen's.

33. In 2010, Mr. Soliman was transferred to a new store and Kyle Jones replaced him as Pharmacy Manager.

34. On several occasions, Ms. Thompson reported violations of pharmacy regulations regarding controlled substances by Mr. Soliman and Mr. Jones to District Manager Coyle.

35. Mr. Coyle was frustrated by Ms. Thompson's insistence that Walgreen's follow applicable laws and regulations.

36. In 2011, Walgreen's transferred Ms. Thompson to a floating position that covered various Walgreen's pharmacies in Northern Virginia and Washington, D.C.

37. The managers of these stores gave Ms. Thompson excellent performance reviews and praised her work in communications to District Manager Coyle.

38. However, in 2012, Mr. Coyle again transferred Ms. Thompson, this time to Walgreen's Woodbridge, Virginia location (Walgreen's Store Number 11299).

39. Ms. Thompson remained a high-performing and successful employee at each of these Walgreen's.

40. In 2013, Ms. Thompson discovered that other pharmacists in the Woodbridge Walgreen's were filling suspicious prescriptions for narcotics.

41. Ms. Thompson knew that Walgreen's had recently been fined by the Drug Enforcement Administration for illegally dispensing controlled substances.

42. In 2013, Ms. Thompson also discovered that other pharmacists were accepting coupons for brand-name medications to discount copayments due through Medicare Part D.

43. Ms. Thompson knew that federal laws and regulations prohibited the use of coupons for medications paid for through Medicare Part D, because accepting copayment coupons often caused Medicare to be charged for more expensive drugs, while Walgreen's and the customer received a kickback for prescribing and purchasing more-expensive drugs.

44. In November 2013, Ms. Thompson reported these violations to new Walgreen's District Pharmacy Manager Charlie John.

45. Mr. John had previously worked closely with former District Pharmacy Manager Coyle, and knew that Ms. Thompson had previously reported multiple compliance issues to Walgreen's supervisors, and further, that the FBI and Virginia Pharmacy Board had investigated and resolved her allegation regarding Ms. Zytcer.

46. Mr. John also knew of Ms. Zytcer's termination directly, as he was one of Ms. Zytcer's supervisors at the time of the investigation.

47. To Ms. Thompson's knowledge, Walgreen's supervisors did not investigate her claims at that time and Walgreen's supervisors did not act to stop the unlawful acceptance of copayment coupons.

*Walgreen's Terminates Ms. Thompson because of her Protected Activity*

48. In a late January 2014 training course, Ms. Thompson was required to disclose any legal or Walgreen's policy violations of which she was aware via the course's online questionnaire.

49. Ms. Thompson disclosed the violations of the Medicare Part D regulations as well as the filling of some suspicious controlled-substance prescriptions by other pharmacists in the online questionnaire.

50. In January 2014, Loss Prevention Manager Donald Dunn met with Thompson to seek additional information regarding the violations she had reported.

51. Ms. Thompson told Dunn that she had acquired firm evidence of the Medicare Part D violations as she had recorded the prescription identifier and phone number of patients when she had witnesses illegal uses of copayment coupons with Medicare Part D.

52. If combined with the store number, which Ms. Thompson memorized, this information would allow an investigator with access to Walgreen's records to review transactions and determine if a coupon was unlawfully used with Medicare Part D.

53. On February 11, 2014, District Manager John terminated Ms. Thompson, claiming that her recording of evidence of the suspicious transactions was itself a violation of the Health Insurance Portability and Accountability Act ("HIPAA").

54. The asserted basis for her termination – that she had violated HIPAA – was clearly pretextual as there was no unauthorized disclosure of protected health information in violation of either that act or its implementing Privacy Rule.

*Ms. Thompson Investigates and Reports Fraud on Medicare*

55. Medicare is a federally funded and administered health insurance program. The Department of Health and Human Services administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS").

56. Medicare Part D is a voluntary prescription drug program for Medicare enrollees.

57. Under Medicare Part D, Medicare contracts with private entities to act as Part D "sponsors," who provide prescription drug coverage to the enrolled beneficiary.

58. When a pharmacy dispenses drugs to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives reimbursement from the plan sponsor for costs not paid by the beneficiary.

59. The Part D sponsor then notifies CMS that a drug has been purchased and dispensed.

60. CMS reimburses the Part D sponsor for the cost of the medication.

61. Part D sponsors subcontract with entities to provide benefits through mail order and pharmacies.

62. As a condition for receiving payment from CMS, a Part D sponsor must certify the accuracy, completeness and truthfulness of all data related to the payment pursuant to 42 C.F.R. § 423.505(k)(1).

63. If claims data has been generated by a subcontractor, that entity must certify that the claims data it has generated is accurate, complete and truthful, and must acknowledge that the claims data will be used to obtain federal reimbursement pursuant to 42 C.F.R. § 423.505(k)(5).

64. Part D sponsors must certify in their contracts with CMS that they agree to comply with all federal laws and regulations designed to prevent fraud, waste, and abuse.

65. Part D sponsors and downstream entities such as pharmacies, must include language in their subcontracts requiring the downstream entity to comply with all applicable federal laws, regulations, and CMS instructions.

66. Additionally, providing remuneration – such as a copayment coupon – purposefully to induce or reward referrals of items or services payable by a federal health care program violates the federal criminal anti-kickback statute codified at 42 U.S.C. § 1320a-7b.

67. Walgreen's, as a downstream entity or Part D sponsor, was required to certify that its claims were accurate, complete, and truthful as a condition of receiving reimbursement from the federal government through CMS.

68. Walgreen's violated Medicare Part D regulations by accepting copayment coupons for name-brand drugs and dispensing name-brand drugs.

69. By accepting copayment coupons for name-brand drugs in violation of Medicare Part D regulations and the federal anti-kickback statute, Walgreen's wrongfully allowed customers to purchase more expensive name-brand drugs rather than cheaper generic drugs.

70. Therefore, each time Walgreen's wrongfully accepted a copayment coupon, Walgreen's caused the federal government through Medicare Part D to pay for more expensive drugs than necessary.

71. Additionally, each time Walgreen's wrongfully accepted a copayment coupon, it accepted remuneration from the company offering the coupon in exchange for prescribing the company's product.

72. Upon information and belief, by dispensing brand-name drugs instead of generic when accepting copayment coupons, Walgreen's falsely certified that the brand-name drugs were required rather than generic drugs in order to receive payment from CMS or the Medicare Part D sponsor.

73. Walgreen's falsely certified that its claims for payment were accurate, complete, and truthful by wrongfully accepting coupons for brand-name drugs.

74. Walgreen's included claims for reimbursement resulting from violations of the federal anti-kickback statute by accepting copayment coupons.

75. Walgreen's records showed that it had unlawfully accepted Medicare Part D copayment coupons for brand name drugs prior to Walgreen's seeking payment and certifying the accuracy of its claims for payment.

76. Walgreen's knew, or should have known, of the falsity of its certification.

77. By recording evidence of Walgreen's unlawful acceptance of coupons and reporting that evidence to appropriate supervisors, Ms. Thompson opposed Walgreen's fraudulent conduct, acted in furtherance of a potential claim pursuant to the False Claims Act, and sought to stop violations of the False Claims Act.

78. The False Claims Act anti-retaliation provision, as amended by the Federal Emergency Relief Act, codified at 31 U.S.C. 3730(h), prohibits the discharge of, or discrimination against, an employee that engages in lawful acts in furtherance of a False Claims Act action or engages in other efforts to stop a violation of the False Claims Act.

*Ms. Thompson's Refusal to Violate the Virginia Drug Control Act and Professional Regulations*

79. The Virginia Drug Control Act, codified at Virginia Code § 54.1-3400 *et seq.*, prescribes the standards for the sale and delivery of controlled drugs by pharmacies to patients, and prohibits the distribution of certain controlled substances without a proper, sufficient prescription.

80. The Virginia Regulations Governing the Practice of Pharmacy, codified at 18 VAC § 110-20-10 *et seq.*, provide that a pharmacist engages in professional misconduct by "[f]ailing to maintain adequate safeguards against diversion of controlled substances;" or by

10

"[f]ailing to exercise professional judgment in determining whether a prescription meets requirements of law before dispensing."

81. Pursuant to Virginia Code Section 54.1-3316, the Virginia Board of Pharmacy may revoke, suspend, or impose a monetary fine on pharmacists who have engaged in unprofessional conduct or has "conducted his practice, or activity requiring a license, permit, certificate, or registration from the Board in such a manner as to be a danger to the health and welfare of the public."

82. Walgreen's employees repeatedly violated the Virginia Drug Control Act during Ms. Thompson's tenure.

83. Ms. Thompson reported these violations to Walgreen's supervisors each time she learned of them, and even reported violations to the FBI when supervisors declined to act in the face of convincing evidence.

84. Ms. Thompson was required by law and regulation to report violations of these laws.

## CAUSES OF ACTION

### COUNT ONE
### RETALIATION
### [31 U.S.C. Sections 3729-3733]

85. Plaintiff re-alleges every allegation.

86. Walgreen's has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section, or who act to stop violations of the False Claims Act.

87. Plaintiff took lawful actions in furtherance of a False Claims Act action, including investigation for a potential action to be filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

88. While employed by Defendant, Plaintiff questioned, investigated, and reported internally Defendant's improper acceptance of copayment coupons in violation of the federal criminal anti-kickback statute codified at 42 U.S.C. § 1320a-7b, and billing for those transactions in furtherance of a False Claims Act action, and also in an effort to stop violations of the False Claims Act.

89. Defendant knew or should have known that Plaintiff's activities investigating and opposing their unlawful conduct, including her investigation for, testimony for, or assistance in an action filed under this section, were in connection with a potential False Claims Act action.

90. Defendant retaliated against Plaintiff for her lawful actions taken in furtherance of a False Claims Act action, including but not limited to her investigation and efforts to prevent further False Claims Act violations by Defendant.

91. Plaintiff complained to Defendant's store and district supervisors on numerous occasions that Defendant was acting illegally by accepting the copayment coupons for medications paid for by Medicare Part D, including reports through 2013 to manager Charlie John and her report in January 2014 to District Loss Prevention Manager Donald Dunn.

92. As a result of her reporting of Defendant's False Claims Act violations to management, Defendant terminated Plaintiff on February 11, 2014 in violation of 31 U.S.C. § 3730(h).

93. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, bonuses,

compensation, employment benefits, career path opportunities, and expenses, in an amount to be proved at trial.

94. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

95. In acting as alleged above, Defendant acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recover punitive damages from Defendants in amounts to be proved at trial.

## COUNT TWO
## WRONGFUL DISCHARGE
### [Virgina Common Law]

96. Plaintiff re-alleges every allegation.

97. Plaintiff refused to participate in the unlawful and criminal distribution of controlled-substances in violation of Virginia law.

98. Plaintiff reported violations of laws and regulations in accordance with her professional obligations under pharmacy regulations, as required for Plaintiff to maintain her right to practice pharmacy in Virginia.

99. Defendant terminated Plaintiff in violation of Virginia public policy.

100. Because of Plaintiff's refusal to violate Virginia law, Defendant terminated Plaintiff, providing a clearly pretextual justification that her recording of information violated

HIPAA, even though that information could not be used to individually identify patients and Plaintiff never disclosed that information other than to supervisors.

101. Because of Plaintiff's report of violations of controlled-substances and Medicare Part D regulations in accordance with her professional obligations, Defendant terminated Plaintiff, providing a clearly pretextual justification that her recording of information violated HIPAA, even though that information could not be used to individually identify patients and Plaintiff never disclosed that information other than to supervisors.

102. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, a loss of wages and salary, bonuses, compensation, employment benefits, career path opportunities, and expenses, in an amount to be proved at trial.

103. As a direct, proximate, and foreseeable result of Defendant's unlawful conduct, Plaintiff has suffered, and will continue to suffer, generally physical, mental, and psychological damages in the form of extreme and enduring worry, suffering, pain, humiliation, embarrassment, mental anguish, and emotional distress, in amounts within the jurisdictional limits of this Court, to be proved at trial.

104. In acting as alleged above, Defendant acted maliciously, fraudulently, despicably, and oppressively, with the wrongful intention of injuring Plaintiff, from an improper motive amounting to malice, and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recover punitive damages from Defendants in amounts to be proved at trial.

## JURY DEMAND

105. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Maria Thompson, prays for the following relief:

Entry of judgment in favor of Plaintiff and against Defendant for

a. Two times Plaintiff's total back pay;

b. Front pay;

c. Compensatory damages;

d. Punitive damages;

e. Reasonable attorneys' fees and court costs associated with this suit;

f. Awarding prejudgment interest, costs and disbursement as appropriate herein; and

g. Other such relief as may be appropriate to effectuate the purposes of 28 U.S.C. Section 3729 and Virginia common law, and as this Court and jury deems equitable, appropriate, and just.

Respectfully Submitted,

_____
Jack B. Jarrett
Va. Bar # 86176
Attorney for Maria Thompson
The Spiggle Law Firm, PLLC
4830B 31st St., S.
Arlington, Virginia 22206
(202) 449-8527 (phone)
(202) 540-8018 (fax)
jjarrett@spigglelaw.com